Jones v. Jones.

SAMUEL W. JONES *et ux: v.* KNOX S. JONES *et al.*[*]

(*Nashville.* December Term, 1924.)

1. **PARTITION.** Deed of life estate with remainder to grantees' children held not partition deed in effect conveying fee.

Conveyance of half of intestate's home place to one daughter and her husband, "as requested by her," during their lives, and then to their children, by agreement among intestate's widow and children, was not mere partition deed, but part of family settlement, and valid as declaration of trust for or covenant to stand seized for use of grantees' children, and did not have the effect of conveying fee to daughter, on the theory that a partition deed operates merely to fix boundaries of tract set apart to conveyee and not to confer title. (*Post, pp.* 563-573.)

Acts cited and construed: Acts 1919, ch. 13.

Cases cited and approved: Whitsett v. Wamack, 159 Mo., 14; Harrison v. Ray, 108 N. C., 215; Fisher v. Strickler, 10 Pa., 348; Barry v. Shelby, 5 Tenn., 229; Sleigh v. Metham, Lutw., Pt. 1, p. 306; Hayes v. Kershow, 1 Sandf. Ch., 263; Doe ex dem. Milburn v. Salkeld, Willes, Rep., 672; Bedell's Case, 7 Coke, 40; Crossing v. Scudamore, 1 Vent., 137.

Cases cited and distinguished: Cottrell v. Griffiths, 108 Tenn., 191; Robertson v. Robertson, 94 Miss., 645; Vanhorn v. Harrison, 1 Dall., 137; Murray v. Kerney, 115 Md., 514.

2. **REFORMATION OF INSTRUMENTS.** Fraud in execution of deed conveying only life estate held not shown.

Evidence *held* insufficient to show fraud warranting reformation of deed conveying only life estate with remainder to grantees' children. (*Post, pp.* 573-592.)

---

[*]As to when may instrument otherwise ineffective as a conveyance of real property be upheld as a covenant to stand seized to uses, see note in 38 L. R. A. (N. S.), 937.

On relief from mistake of law as to effect of instrument, see note in 28 L. R. A. (N. S.), 785.

Jones v. Jones.

3. REFORMATION OF INSTRUMENTS. Accident in execution of deed conveying only life estate held not shown.

Evidence *held* insufficient to authorize reformation of deed conveying only life estate with remainder to grantee's children, as having been executed by accident. (*Post, pp.* 592, 593.)

Cases cited and approved: Irwin v. Planters' Bank, 20 Tenn., 145; Scott v. Watson, 3 Tenn., Ch., 652.

4. REFORMATION OF INSTRUMENTS. "Accident," "fraud," "mistake," and "negligence," distinguished.

"Accident" is unexpected occurrence, external to party affected, while "mistake" is internal, a mental condition, conception, or erroneous conviction, influencing will and leading to outward physical manifestation, ordinarily affirmative, viz., doing of act which would not otherwise have been done, its essential prerequisite being ignorance, which distinguishes it from "fraud," wherein knowledge and intent are actually or theoretically present, and "negligence," in which inattention or absence of thought are inherent. (*Post, pp.* 593, 594.)

5. REFORMATION OF INSTRUMENTS. Instrument reformed for mistake only on clear and convincing proof.

For court of equity to reform written instrument for mistake, proof must be clear and convincing. (*Post, pp.* 594, 595.)

Cases cited and approved: Battle et al. v. Claiborne, 133 Tenn., 286; Cromwell v. Winchester, 39 Tenn., 389; Barnes v. Gregory, 38 Tenn., 230.

6. REFORMATION OF INSTRUMENTS. Mistake in execution of deed conveying only life estate held not shown.

Evidence *held* insufficient to show mistake in execution of deed, conveying only life estate with remainder in grantees' children. (*post, pp.* 595, 596.)

Case cited and approved: Alexander v. Shapard, 146 Tenn., 90.

7. REFORMATION OF INSTRUMENTS. Mutual mistake, or mistake of one party influenced by other's fraud, essential.

To reform written instrument for mistake, there must have been mutual mistake, or mistake of one party influenced by other's fraud. (*Post*, p. 596.)

Cases cited and approved: Baker v. Harlan, 71 Tenn., 505; Graham v. Guinn, 43 S. W., 749.

Case cited and distinguished: Pittsburg Lumber Co. v. Shell, 136 Tenn., 466.

8. **QUIETING TITLE.** Relief to complainant, not entitled to reformation of deed granting only life estate, not warranted by statute authorizing designation of unborn remaindermen as parties defendant.

Relief cannot be granted under Pub. Acts 1919, chapter 13, section 1, where complainant is not entitled to reformation of deed conveying only life estate to her; there being no cloud to be removed. (*Post*, pp. 596, 597.)

Acts cited and construed: Pub. Acts 1919, ch. 13, sec. 1.

---

*Headnotes 1. Partition, 30 Cyc, p. 166 (1926 Anno); 2. Reformation of Instruments, 34 Cyc, p. 986; 3. Reformation of Instruments, 34 Cyc, p. 986; 4. Reformation of Instruments, 34 Cyc, pp. 908 (1926 Anno), 909; 5. Reformation of Instruments, 34 Cyc, p. 984; 6. Reformation of Instruments, 34 Cyc, p. 986; 7. Reformation of Instruments, 34 Cyc, pp. 915, 921; 8. Quieting Title, 32 Cyc, p. 1314.

---

FROM WILLIAMSON.

---

Appeal from the Chancery Court of Williamson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—Hon. J. C. Hobbs, Chancellor.

T. P. Henderson, for plaintiff.

R. H. Crockett, for defendants.

Mr. MALONE, Special Judge, delivered the opinion of the Court.

The bill in this case was filed to reform a deed, under the inherent jurisdiction of the chancery court, and, under the provisions of chapter 13 of the Acts of 1919, to have the objectionable clauses of the deed declared clouds on the complainants' title.

The chancellor and court of civil appeals have concurred in granting the relief prayed, and the guardian *ad litem* of the minor defendants brings the case here by petition for *certiorari*.

The essential facts disclosed by the record are, in substance, these:

George W. McKee, a citizen of Williamson county, died intestate in January, 1915, leaving a considerable estate, consisting of both real and personal property.

Surviving him were his widow, Mrs. M. L. McKee, and several children, including the complainant, Mrs. Ida Jones, wife of Samuel W. Jones. Mrs. Jones and her husband had children who were then all minors. These children, and their issue, born or unborn, are made defendants; and those who are minors constitute the minor defendants in whose behalf the present petition for *certiorari* is brought.

In May, 1915, the widow and children of the intestate entered into a certain written agreement, by way of a family settlement, providing for a division of the real and personal estate among the parties, and also making provision for the widow's homestead and dower rights. The terms of this instrument which especially concern the land now in question are as follows:

"To Mrs. Ida Jones is given and set apart the remaining one-half of the home place of said G. W. McKee designated on the plat herewith at lot No. 1, and conveyance made to her and husband and children as requested by her, said lot No. 1, being described as follows:" (Here follows a particular description, by metes and bounds, of a tract containing eighty acres.)

"To have and to hold the above-described lot of land to Mrs. Ida Jones and husband, S. W. Jones, during their natural lives and then to their children or descendants. And we the undersigned Mrs. M. L. McKee, Mrs. Minnie Sparkman and husband J. C. Sparkman and George M. Gooch hereby transfer and convey all our right, title claim and interest in and to the above described lot of land to the above-named grantees their heirs and assigns forever. And we covenant with the grantees that we will warrant and defend our title to our said interest in said real estate to said grantees against the lawful claims of all persons whomsoever."

This instrument is signed and acknowledged by the children and heirs at law of the intestate, and also by his widow, Mrs. M. L. McKee.

By the same instrument other tracts of land are conveyed to the respective heirs, but they are conveyed absolutely and without limitation.

About three years after this deed was executed, Mrs. Jones and her husband attempted to borrow money, secured by a mortgage on the land and it was then for the first time discovered (as complainants claim) that they had only estates for life, with remainder to the children, etc. As soon as they learned of these limitations in the deed, complainants consulted Mr. R. H. Crockett, a member of the Franklin Bar, and he advised that the

matter could only be remedied by filing a bill and asking the courts to reform the deed. The bill was not filed then (as complainants testify), on account of the wife's condition, she being then sick, weak, nervous, and unable to testify, and also on account of their financial condition.

Thereafter, complainants did negotiate two loans on the property, secured by deeds of trust, or mortgages, executed by complainants, and also by the two older sons who had then attained their majority.

In April, 1922, they filed the original bill for the purposes already stated.

The court of civil appeals affirmed the chancellor's decree on two grounds:

(a)  Because the testimony made out a case for reformation.

(b)  Because Mrs. Jones' title, as tenant in common, came to her by descent from her father, and did not depend on the deed executed by her cotenants; the court being of opinion that the deed executed in no wise changed or affected her interest or title. To sustain this holding the case of *Cottrell* v. *Griffiths* (1901), 108 Tenn., 191, 65 S. W., 397, 57 L. R. A., 332, 91 Am. St. Rep., 748, is cited.

First.  Is the case controlled by *Cottrell* v. *Griffiths*?

The substance of this case is thus stated by Chief Justice SNODGRASS, speaking for the court, in the opening sentences:

"The question involved in this case is what is the legal effect of a partition deed executed by two tenants in common, to a third tenant, a married woman, where the deed includes the husband as joint grantee, though no agreement upon any consideration was made for such

conveyance, or, in fact, made at all, but deed was executed under the following circumstances and upon the facts so showing, found by the court of chancery appeals. Jessee Wells, the father of Mrs. Ford, Mrs. Cottrell and Mrs. Griffiths, was the owner of the land in controversy. He died, and it descended to these married ladies, as tenants in common. Mrs. Griffiths and Mrs. Ford conveyed to Mrs. Cottrell her share of the land, and, later, undertook to have the remainder of the land partitioned between them. A surveyor and notary were employed to partition and draw deeds, to be executed by the parties, each to the other, for the shares so surveyed and partitioned. This was done, but in drawing the deeds without direction from the parties, and not in accord with their intention, the notary named the husbands of the two married women as conveyees. The parties were all dissatisfied with this form of conveyance, the husbands setting up no claim of right, or agreement upon any consideration, or without consideration, to have it done. The draughtsman was consulted, and he said the deeds conveyed no interests to the husbands as matter of law, but that he would insert a clause removing any supposed difficulty on this point. and thereon he interlined a clause showing that the deeds were in division of the lands of Jesse Wells, deceased (as already stated, the father of the married women attempting the partition).

"This was not altogether satisfactory, but they agreed to keep the deeds from record until they could take advice and look further into the matter. The husbands and wives concurred in this, and so the matter ended. The deeds were taken and kept by each without registration, or further action, until four days after the death of Mrs.

Griffiths, which occurred on the 16th of February, 1901. The deeds were dated and put in possession of the parties on the 4th of October, 1892.''

After stating that the court of chancery appeals held that the deeds were never delivered, and therefore did not pass upon their legal effect, and expressing the conclusion that ''what occurred did not bind the conveyee, Mrs. Griffiths, to a release of her interest, in whole or in part, to her husband,'' the court states, at page 195 (65 S. W., 397), that ''such would not have been the effect' of the deed had it been to the satisfaction of the parties and unqualifiedly delivered,'' and then continues:

''We think the proposition of law is soundly settled, in best-reasoned cases, that partition by decree or deed between tenants·in common, when they are married women, and the decree or deed includes husbands with their wives as decretal parties or joint conveyees, carries no other or more interest to the husband, than if such decree or partition deed had been made to the wife alone. Such decree or deed only adjusts the rights of the interested parties to the possession. It makes no new title or change in degree of title. Each does not take the allotment by purchase, but is as much seized of it by descent from the common ancestor as of the undivided share before partition. The deed of partition destroys the unity of possession, and henceforth each holds her share in severalty, but such deed confers no new title or additional estate in the land, or, we may add, less estate than that descended. The title being already in'her, the deed merely designated her share by metes and bounds, and allotted it to be held in severalty. *Whitsett* v. *Wamack* (Mo.), 59 S. W. Rep., 961, and authorities cited.

150 Tenn.—36.

"This being the law, it makes no difference whether deed of partition was made to Mr. and Mrs. Griffiths, or to her alone, or made to both or was in fact delivered, as the result would have been the same so far as the rights of both or either were concerned. The husband could, under such deed, take no more interest than he could under one made to his wife alone."

It will be noted that in the foregoing case separate deeds were executed to the different tenants in common.

The same is true in the case of *Whitsett* v. *Wamack* (1900), 159 Mo., 14, 59 S. W., 961, 81 Am. St. Rep., 339. In that case, as appears from the opinion (page 17 [59 S. W., 961]), the three children made a voluntary partition of the father's real estate "by means of three deeds."

In the case of *Harrison* v. *Ray* (1891), 108 N. C., 215, 12 S. E., 993, 11 L. R. A., 722, 23 Am. St. Rep., 57 (one of the principal authorities relied on by the court in deciding the case of *Whitsett* v. *Wamack,* supra), the heirs "divided the lands" inherited by them from "their father by deeds of partition . . . without legal proceedings." The deed made to Oakley Harrison, one of the brothers, contained the name of his wife, Juda. After his death she claimed as tenant by the entirety. Answering the contention that the deed was conveyed to Harrison and wife jointly, by his direction, the court said:

"Suppose this to be so. The grantors were not conveying any additional estate or interest to Oakley Harrison. He had bought nothing and they were not making him a present of anything. The deed only assigned to him in severalty and by metes and bounds what was already his. The grantors conveyed no part of their

shares. They had no interest in the share embraced in the deed to Oakley Harrison, and could convey no interest therein to him or any one else. It was his by the conveyance from his father. He received no title nor estate by virtue of the deed from his brothers and sisters, nor could his wife. His direction to the other heirs (if given) to convey to himself and wife could not have the effect to make the deed a conveyance of anything to his wife when it was not such as to himself. The title being already in him the deed merely designated his share by metes and bounds and allotted it to be held in severalty. No title passed by the deed, nor by any of the deeds.''

It is evident that the case of *Cottrell* v. *Griffiths* was correctly decided, and doubtless the authorities on which it is based announce a correct rule of law as applied to the facts of those cases. The reasoning is that the other cotenants, in making a deed, could convey no title, and could do no more than fix the boundaries of the tract set apart to the conveyee, title to which came from the ancestor by descent cast.

But it seems equally apparent that these authorities are to be distinguished from the instant case. For here the husband and wife have joined in a writing limiting the wife's share to a life estate, and creating an interest for their children.

The instrument under consideration in the present case is further to be distinguished in two particulars:

(a) It is something more than a mere partition deed. The opening paragraphs are as follows:

''This contract, agreement, family settlement and partition deed made by the undersigned, the widow and heirs

at law and next of kin of George W. McKee, decd., witnesseth as follows:

"The undersigned Mrs. M. L. McKee the widow of G.W. McKee decd. and Mrs. Minnie Sparkman, and Mrs. Ida Jones children of said G. W. McKee, decd. (their husbands J. C. Sparkman and S. W. Jones joining) George M. Gooch, a grandchild, son of a decd. daughter (his father T. R. Gooch joining), have agreed to a settlement and division of the personal and real estate of said G. W. McKee dec'd as hereinafter set out, to-wit:

"First. It is understood and agreed that the widow Mrs. M. L. McKee who is the administratrix of the estate of G. W. McKee decd. shall pay all debts and taxes due from the estate of said G. W. McKee decd. out of the personal property of said estate and shall pay to George M. Gooch the sum of six hundred dollars from the personal estate of said G. W. McKee decd. and the balance of the personal estate of said G. W. McKee shall pass to and become the absolute property of the said Mrs. M. L. McKee in consideration of which the said Mrs. M. L. McKee releases and quitclaims and conveys to the other parties hereto all her homestead and dower rights in and to the real estate belonging to the estate of the said G. W. McKee decd.

"Under this agreement the real estate of said G. W. McKee's estate is divided as follows."

One-half of the home place (a tract of approximately eighty acres) is then "given and set apart" for Mrs. Sparkman, and "the undersigned Mrs. M. L. McKee, Mrs. Ida Jones and husband S. W. Jones and George M. Gooch, do hereby transfer and convey all our right, title, claim and interest in and to the above-described lot of

Jones v. Jones.

real estate to the said Mrs. Minnie Sparkman her heirs and assigns forever.'' Then follows a covenant of general warranty on the part of these grantors to Mrs. Sparkman.

Next comes the conveyance of the remaining one-half of the home place, approximately eighty acres, to the complainant Mrs. Ida Jones in the language already quoted.

Following this is a provision whereby Mrs. Sparkman and husband, Mrs. Jones and husband, and George M. Gooch, ''release and transfer all our rights in the personal estate of said G. W. McKee to Mrs. M. L. McKee in consideration of her release of homestead and dower rights in real estate as above set out.''

It is evident that this instrument is a family settlement, fixing the rights of all parties in the real and personal estate of the intestate, and something more than a mere partition deed.

(b) The case of *Cottrell* v. *Griffiths* and the authorities on which it is based are all concerned with husbands and wives. In none of these did the deed contain a provision for the children. In the deed now under consideration the eighty acres of the home place, which was ''given and set apart'' to Mrs. Ida Jones, was conveyed ''to her and husband and children as requested by her.'' The law would in general give husband or wife certain interests in the property of the other. It may, therefore, be true that in *Cottrell* v. *Griffiths,* and similar cases, the draftsman was merely attempting to do what the law would do independently of a deed.

But such reasoning as this cannot apply to the case of children.

We are unable to see why, in a family settlement of this nature, one of the beneficiaries might not agree to hold his or her share for the benefit of the children, rather than take it in fee simple. If Mrs. Jones wished to hold merely a life estate in this property, with remainder to her children, we see no reason why this might not be done. It would be, in effect, a declaration of trust made by her for their benefit. The children's claim, in such a case, would derive its validity not merely from the agreement of the other parties interested in the estate, but from the express written agreement signed by Mrs Jones.

Her agreement would be, perhaps, more accurately described as a covenant to stand seized for the use of her children.

In the case of *Robertson* v. *Robertson* (1909), 94 Miss., 645, 47 So., 675, 136 Am. St. Rep., 589, husband and wife entered into a written agreement to the effect that on the death of either all their property should belong to the other for life, and that on the death of the survivor it should be divided by commissioners among certain designated kindred. It further provided that the instrument should operate as a conveyance and as a will, and that the husband should be appointed guardian of the children and executor of the personal property, etc.

Shortly after the instrument was executed, the husband died, and the wife filed a bill stating that she was illiterate, and ignorant of the effect of the instrument, and believed that she was executing a will revocable at her pleasure, etc. She thereupon sought to cancel it, as having been executed by reason of mistake, undue influence, or fraud, and because a cloud on her title. After holding that the instrument was fairly executed, and rep-

resented the wishes of the parties at the time, the court says:

"If the instrument be construed as a compact, or, perhaps more accurately, a covenant to stand seized to the use of the grantees named, which construction seems to us the correct one, then clearly the suit must fail."

It was then said that if the instrument should be considered a mutual or joint will, the surviving testatrix could not revoke the will as to the estate belonging to the deceased, which became vested on his death.

In the case of *Fisher* v. *Stricker* (1849), 10 Pa., 348, 51 Am. Dec., 488, two brothers executed an agreement, the substance of which was that if either should die without issue the survivor should be the sole heir. of the one deceased, and entitled to the sole possession and ownership of his estate.

This was held sufficient to create a covenant to stand seised to uses—the consideration being natural love.

With respect to a covenant to stand seised for the use of another, it was said in the case of *Vanhorn* v. *Harrison,* 1 Dall. (Pa.), 137, 1 L. Ed., 70, 1 Am. Dec., 229:

"Blood or marriage are the most common and suitable considerations in this species of conveyance."

In the case of *Barry* v. *Shelby* (1817), 4 Hayw. (Tenn.), 229, the bill stated that one Laban Berthel, being then seized in fee of a tract of land containing one hundred fifty acres, "executed a deed by which, after disposing of his personal estate, he disposed of the land in the following clause: "Also I give after my death, and the death of my wife, Mary Berthel, all the tract or parcel of land which I now live on, which was granted to me by deed by William Berthel; bearing date the 18th day of

July, 1797, for one hundred fifty acres, be the same more or less; to be equally divided amongst all my aforesaid children; being Willis Berthel, Rhoda Berthel, Enos Berthel, and Mary Berthel, to them and their heirs forever."

Soon after, the maker of this instrument died, and his wife married again. The question considered by the court, on bill and demurrer, was whether the wife and children took any interest under this document. The court says, at page 231:

"On the first ground of the demurrer it was argued in this case, that nothing by the deed of Laban Berthel passed to him or to his wife; that saying therein, 'I give after my death and the death of my wife, to my children,' is binding an estate of freehold to commence in future, which the rule and policy of the law will not admit; that here is no previous estate to support the interest or estate intended to be given to the children as a remainder. For that every gift or grant requires proper parties as donor and donee, grantor and grantee, which do not exist here, being only husband and wife; and a man cannot give to himself; and, for the same reason, he cannot give to himself and wife; for in contemplation of law they constitute one person. This may be correct when applied to feoffment at the common law, but not when applied to a covenant to stand seised, operating under the statute of uses. In a covenant to stand seised a freehold may commence in future, for the court in conveyances to uses, in order to support limitations when no particular estate has been granted, hath raised a particular estate by implication; thereby establishing a maxim of equity, that so much of the use as a man does not dispose of remains with him. As, a grant to the use

of B., to commence four years from thence, is good; for till the expiration of the four years the use results to the grantor. So if a man covenants to stand seised to the uses of his own heirs of his own body, the grant is good, and until it takes place the use results. Sanders on Uses, 133. By the common law a man could not make a conveyance or give [livery of seisin] to himself; but he may by way of use, as a feoffment to another for his use, a lease or release to another for his use, and the like; in such case the limitation of the use is good, and the statute executes it on himself. A man may covenant to stand seised to the use of himself. Sand. 130. Two questions then arise under this deed. First, is it a covenant to stand seised? Secondly, is there a limitation to Laban Berthêl himself and wife, for life? No particular form of words is necessary to constitute a covenant to stand seized. The consideration is the chief requisite to characterize and to support it, as such a conveyance. This consideration is blood and marriage. It is here to be observed, that if the consideration appears upon the deed, though there be no express words of consideration, yet it is sufficient to raise an use by way of covenant; as, if a man covenants to stand seised to the use of his son, daughter, wife, etc., without saying in consideration of the natural love and affection he bears towards them, this covenant is capable of raising an use. In the present case the father gives to his children, naming them, and it is apparent from the subsisting relation of parent and child that it is for the natural love and affection which he bears them, without expressing it in so many words, that he makes the gift, and so the law construes it. Sand. on Uses, 438. The words grant, bargain, sell, enfeoff, con-

firm, are considered equally operative as the words 'covenant to stand seised,' and *pari ratione* must the word used in this deed, to-wit, give, a word more consonant to the nature of this particular transaction and the truth of the case than some of those mentioned, as sell, etc. From this view of the deed set forth in the bill, it may be with propriety considered. as a covenant to stand seised.''

In the case of *Murray* v. *Kerney* (1911), 115 Md., 514, 81 A., 6, 38 L. R. A. (N. S.), 937, an agreement in writing which was executed, acknowledged, and recorded as a deed between four sisters, tenants in common of certain real estate, providing that the title should vest in the survivors as each one may die, was held to be valid as a covenant to stand seized to uses. The writing was in the following language:

''We, the undersigned, daughters of the late Peter and Elizabeth Murray, named and subscribed to this instrument of writing, do enter into an agreement that for the benefit of each and all of them named and subscribed to this agreement and are now living in and owners jointly the property being their joint interest left them, Lucy A. Murry, Ann Murray, Sarah A. Crawford, and Jane J. Murray, as heirs of the above Peter and Elizabeth Murray, property situated on the southwest corner of Gay and Canal streets (now Central avenue) the object of this is that in case that if by death should take one of the parties, the other three sisters are the owners, and if two are taken by death, then the two remaining sisters are the owners, and if by death one of the two sisters is taken then the last surviving sister is the owner, and in order to carry faithfully this agreement, we hereunto set our hands and seals and subscribe our names

this second day of December, in the year eighteen hundred and eighty-five.''

After discussing other matters, the court says:

''If, for any of the reasons assigned by the appellant, the instrument of writing mentioned in this case should be inoperative as a common-law deed, we think that it is effective as a covenant to stand seised to uses under the statute of uses.  Blackstone defines a covenant to stand seised to uses as a 'species of conveyance  .  .  .  by which a man seised of lands, covenants, in consideration of blood and marriage, that he will stand seised of the same to the use of his child, wife, or kinsman, for life, in tail or in fee.  .  .  .  But this conveyance can only operate when made upon such weighty and interesting considerations as those of blood and marriage.'  Bk. 2, Bl. Com., 338.  'No particular form of words is necessary to constitute a covenant to stand seised.  The consideration is the chief requisite to characterize and to support it as such a conveyance.  This consideration is blood and marriage.  .  .  .  If the consideration appears upon the deed, though there be no express words of consideration, yet it is sufficient to raise an use by way of covenant.'  *Barry* v. *Shelby,* 4 Hayw. (Tenn.), 229, 231, Lord COKE, in treating the statute of uses, says: 'The intention of the parties is the principal foundation of the creation of uses.'  And in *Sleigh* v. *Metham,* Lutw., pt. 1, p. 306, the court says:  There is 'no conveyance (that) admits of such variety of words as that of a covenant to stand seised.'  *Hayes* v. *Kershow,* 1 Sandf. Ch., 263. 'The covenant must, of course, be by deed, in order to constitute it a covenant; and the usual term employed in creating it is ''covenant,'' though any other words may

be adopted which are tantamount' thereto.  2 Wash. Real Prop. section 1379.  The deed or instrument of writing that was before the court in the case of *Fisher* v. *Strickler,* 10 Pa., 348, 51 Am. Dec., 488, was as follows: 'Now, know ye, that we, the said Jacob Strickler and Christian Strickler, have this day agreed with each other, that in case if one of them shall happen to die unmarried, or intermarried and without lawful issue or issues that should arrive to the age of twenty-one years, that then and in that case the survivor of them shall be the sole heir of the deceased one, both to the real and personal estate of the deceased, without any further deed or conveyance; to hold the real estate as well as the personal estate of the deceased unto the survivor and to his heirs and assigns forever.'  The court, in adopting the opinion of the lower court, said:

"The instrument of writing set forth in this case is what is technically called a "covenant to stand seised to uses."  The words are sufficient to create the covenant, the intention being apparent on the face of this deed that each party should stand seised to the use of the other surviving him under the circumstances stated.  And the consideration of natural love, though not expressed, is manifest from the relation of the parties.  .  .  .  *Doe ex dem. Milburn* v. *Salkeld.,* Willes, Rep., 673; *Bedell's Case,* 7 Coke, 40; *Crossing* v. *Scudamore,* 1 Vent., 137, 14 Eng. Rul. Cas., 790; 3 Cruise's Dig., pt. 4, 186-190.'

"In this case, as it is conceded, the four sisters were seised in fee, as tenants in common, of the lands in question, and, being so seised, executed the deed or agreement above set forth.  Each was seised of a one-fourth undivided interest in the said land, and by deed or in-

strument of writing, each covenanted to stand seised of her interest therein to her use during her life, and upon her death to the use of such of her sisters as survived her, successively to and including the last survivor, who became seised thereby in fee of the interest of all of the sisters in said lands.''

In the note to this case, as reported in 38 L. R. A. (N. S.), p. 937, will be found various authorities on the point of upholding an instrument, invalid as a conveyance of real estate, as a covenant to stand seised for uses; and it is there said that such a covenant, ''although in disuse as a general form of conveyance, is frequently resorted to by the courts for the purpose of effectuating the intention of the parties, by validating instruments which would otherwise have been insufficient under other rules and forms of conveyance.''

Second. Can the decree of the court of civil appeals be supported on the theory that complainant is entitled to a reformation or cancellation of the deed, as having been executed by fraud, accident, or mistake?

This necessitates a discussion of the evidence.

In the reply brief of able counsel, for the complainants it is stated that they are willing to rely upon the ''digest of the proof'' set out in the petition for *certiorari* filed on behalf of the minor defendants.

At the risk of prolixity, we incorporate this statement of the proof, with some immaterial omissions, as follows:

''1. Witness Mrs. Ida Jones testifies:

''That she is wife of complainant Sam W. Jones, and a daughter of George W. McKee, who died intestate in Williamson county, in January, 1915; that intestate left two children living, witness and defendant, Mrs. Minnie

Sparkman; that another daughter, Mrs. Maude Gooch, predeceased her father leaving one child, a son, the defendant George Gooch; that the husband of defendant Mrs. Minnie Sparkman has died since the execution of the deed in question; that complainant witness is now fifty-two years old, and is the mother of three children, defendants Knox S. Jones, James C. Jones, and Percy S. Jones; that Knox S. Jones is married and has four children, all of whom are before the court; that James C. Jones is married and has one child, who is before the court; that witness' son Percy S. Jones is unmarried, and that all of her grandchildren are minors without general guardian; that for some time prior to May 26, 1915, complainant witness was in very poor health, in a nervous, broken down condition; that witness' father, George W. McKee, left considerable personal property and land in Williamson and Maury counties, and his widow, witness' mother, qualified as administrator, and in order to effect an economic settlement a family agreement was entered into. This agreement was finally signed on May 26, 1915, and the matter had been discussed and talked about and the lands had been surveyed and divided into parcels some time before that, but not very long. Witness understood that she was to receive eighty acres of land in Williamson county as her share of her father's estate, in the land, and had been surveyed and witness knew its location and boundaries.

"Further questioned, complainant witness testified:

"31. In the course of your talk and discussions with your mother, sister, and others in the adjustment and division of your father's lands, before the agreement and partition deed was signed, was anything said about your

husband or children, in connection with your lands, and how did you understand that you would take and hold the eighty acres of land to be set apart to you?

"A. Nothing was said about this at all to me, and I assumed and understood that I would take this eighty-acres of land as my property by descent from my father. On the morning the deed was signed, Mr. Jones, my husband, said something about he ought to have the rights of my husband in the land if I died before he did, but I did not make any agreement as to this, and left the matter to pass as the law would direct. I did not enter into any agreement with anybody about it, but do recall that my husband said that he ought to have the husband's right if I died before he did. I did not make any agreement to give him anything that the law did not give him, but I was entirely willing for him to have what he was entitled to by law.

"32. Do you recall the occasion in May, 1915, when the members of the family came to Franklin to sign the agreement for the division of the estate?

"A. Yes, I remember it.

"33. Prior to that time had you made any agreement with any one to prepare the paper to be signed?

"A. No, I had not.

"34. Do you know whether any other member of the family or person interested had arranged with any lawyer or other person to prepare the contract, agreement, and settlement which you expected to enter into?

"A. No, nothing was said to me about this, and I knew nothing of it.

"35. Do you remember the day of the month and year that the paper was signed?'

"A.   The deed bears date May 28, 1915, and I know it was about that time; but I have no recollection of the exact date further than what appears on the deed.

"36.   Who came to town that day to enter into the agreement and division?

"A.   I came, Mr. Jones came, my sister Mrs. Sparkman, Mrs. M. L. McKee, my mother, by nephew George Gooch, and Mr. J. C. Sparkman, my sister's husband, who was then living, and T. R. Gooch, who was the husband of my deceased sister, and my uncle John Rountree, of Maury county.

"37.   What part or interest did your uncle Mr. Rountree have in it?

"A.   I don't know that he had any, nothing that I know of.

"38.   Did he talk with you about the division, or how it'ought to be made?

"A.   No.

"39.   Did Mr. Sparkman, your brother-in-law, talk with you about your share in the estate, and how you would take it, and what the contract would provide with reference to it?

"A.   I do not recall talking with Mr. Sparkman about my share at all.   If he said anything to me I don't remember it.

"40.   Now, when you came to Franklin the day the deed was signed, where did you and the other members of the family meet to transact the business?

"A.   We went to the Williamson County Bank Building, I understood it was Mr. J. F. Eggleston's office.

Jones v. Jones.

"41. Did you have any information before you went to Mr. Eggleston's office that he was to draw the papers to be signed?

"A. Yes, somebody had told me before we went to his office that he had been engaged to draw the papers. I cannot now say who told me this. I was with my husband, my sister, my mother, and the others above mentioned, that morning in town before we went to Mr. Eggleston's office, and I learned in some way that he would draw the papers, but I cannot now say who told me, I don't remember.

"42. Did any one tell you or advise with you as to what the contract would contain, or should contain, with reference to your share?

"A. Nothing of this kind was said to me by any one, and it was not discussed at all, except that my husband, Mr. Jones, said to me that he thought that he ought to have the husband's rights under the law in the land if I died before he did. This was while we were up at the Roberts Store, over across from the bank. When he said this, I think I cried. I was then in a very nervous condition, and did not agree to it, and did not object. I may have said, 'I don't care.'

"43. With reference to this statement by your husband, what did you understand that he was asking of you?

"A. I thought that he meant that he wanted to have what rights the law would give to the husband in the wife's land, if I should die before he did; that he did not want to be cut from these rights. I did not understand that he was asking that he be given anything that the law would not give in the wife's lands.

150 Tenn.—37.

"44.  When you went to the office of Mr. Eggleston at the bank to execute the contract, who was there beside Mr. Eggleston?

"A.  The whole family, the ones I have named above already.

"46.  Up to that time had you talked with Mr. Eggleston, or with any member of the family, or with Mr. Sparkman or Mr. Rountree, or with Mr. Gooch, about what the deed and contract would contain with reference to your share?

"A.  No, I hadn't said anything to any of them.

"Q.  Had any of them said anything to you?

"A.  No.

"47. When you arrived there, had Mr. Eggleston already prepared the contract, agreement, and deed to be signed, or did he write it after you got there?

"A.  He had it already written when I got there, and produced it there before us.

"48.  Did he read the paper in your hearing; if so, how was it read?

"A.  Yes, he read it there before us all.  He just hurriedly read it through.

"49.  Did he explain to you the part of the instrument which related to you, and show you how the language used would affect your property?

"A.  No, he did not.

"50.  Did you then understand that the paper which was prepared to be signed did more, with reference to your share, than to set apart to you the eighty acres of land, which you had inherited from your father?

"A.  No, I did not.  I understood that I was to have the eighty acres as my share, inherited from my father,

and nothing had been said about any change or special agreement, and I thought I was simply taking my share.

"51. After Mr. Eggleston read the paper over as you have stated, and before it was signed, did you read it over; and, if not, why not?

"A. No, I did not. I had confidence in all of the parties, I was sick and tired, and I thought it was all right.

"52. Have you any special knowledge of the language used in papers of this kind and of the meaning of the terms made use of by lawyers to limit and restrict land titles to person's children and descendants?

"A. No, I grew up in the country, a country girl; have been a farmer's wife; I had only the education received at the common free schools; I know nothing of legal and law terms, and had never read papers of this kind; and I don't suppose I would know the meaning of this language if I heard it.

"53. I am handing you a paper bearing date of May 26, 1915, signed by Mrs. M. L. McKee, Mrs. Ida Jones, Mrs. Minnie Sparkman, S. W. Jones, J. C. Sparkman, George M. Gooch and T. R. Gooch, and I will ask you if you signed that paper, and acknowledged it on the day it bears date, as the agreement and partition deed dividing your father's estate?

"A. Yes, that is the paper that Mr. Eggleston read over, as I stated above, and I signed it along with the others."

"56. Prior to that time had you made any agreement or had understanding with your husband or with your children or with any one else that this partition deed should contain the language, 'to her and her husband and children as requested by her,' and the language, 'to

have and to hold the above-described lot of land to Mrs. Ida Jones and husband S. W. Jones, during their natural lives and then to their children or descendants' and the language 'to the above-named grantees, their heirs and assigns forever?'

"A. No, I had made no such agreement with any one.

"57. Did you receive anything of any character or value from your children or any of the ———, or from your husband, or from any one else in consideration of this language being inserted in said deed?

"A. No such thing ever occurred.

"58. Did you ever make any request of Mr. Eggleston to place the language above referred to, undertaking to limit the title to said property to your husband, children, or descendants, in said deed?

"A. No, I know nothing about it.

"59. Did you ever request any one else to ask him to insert this language in the deed?

"A. I did not.

"60. Was the matter of inserting the language of this kind in the deed ever brought to your attention or discussed with you by any one, and did you ever make any request in any way, authorizing the deed drawn in this way?

"A. No, I never did.

"61. When the deed was read over to you by Mr. Eggleston in the manner which you say it was, did you notice this language and know or realize what its effect on the title to your land would be?

"A. No, I did not understand it. I simply thought they were setting apart to me my share in father's land, which I understood was the eighty acres I have referred

to. I did not know anything about this langauge at the time. I was sick and paid no attention to it, and did not try to understand it. I just trusted these things to the rest of them and thought they were setting apart my eighty acres to me.

"62. When did you first learn that the deed contained the language appearing to limit your title to your husband's children and descendants?

"A. It was about three years after the date of the deed; I cannot say the exact date, but my husband and I had a plan to buy the adjoining tract, the part of my father's land, which was set apart to my sister, Mrs. Minnie Sparkman, being lot No. 2, on the plat with the deed, containing eighty acres. Our idea was to make a mortgage on our land and the tract to be bought from her and borrow enough money to pay her for her land, to get the loan on a long time and pay it off as we made it. But when we went to borrow the money, objection was made at the bank, or by the people we tried to borrow from, that the children and descendants had a claim on the land and we could not borrow it. This was the first time I had any knowledge of these conditions in the deed.

"63. What did you do when you learned of this condition?

"A. We had to abandon the plan to buy my sister's land, because we could not borrow the money on the land with the deed in the condition that it was in. I immediately went to see Mr. R. H. Crockett, a lawyer in Franklin, and he advised me that the matter could only be remedied by filing a bill and asking the courts to reform the deed.

"64. Why didn't you file the bill then?

"A. I was at that time sick, weak, and nervous, and unable to come to court to testify and make a statement of the facts, and Mr. Crockett suggested that it would be better to wait awhile until my health was better and I was able to give it attention.

"65. Did you subsequently borrow money from Mr. W. B. Marr, trustee, and from the Thompson Station Bank & Trust Company, secured by deeds of trust or mortgages on this property, in which your two sons who are of age joined?

"A. Yes, we became involved financially, and I had to have some money, and we executed the deeds of trust to get Mr. Marr and the bank to let us have it.

"66. Why did you have your two sons and their wives join in these deeds of trust?

"A. Because Mr. Marr and Mr. Timmons and the bank people would not lend us the money unless they joined. We had to have the money, and we had to sign up the papers as they said, or they wouldn't let us have it.

"67. Is it your desire that these debts shall remain a charge against the property according to their priorities?

"A. Yes, we borrowed the money and gave the mortgages to secure it."

"69. Is it your desire that the court shall so modify and reform the deed which you signed as to vest in you the title in fee to said tract of land containing eighty acres, subject only to such rights as the defendants W. B. Marr, trustee, and T. J. Timmons, trustee for the use of the owners and the debts secured by them, may have acquired under their deeds of trust from you and your husband?

"A.   Yes, sir; I want the deed made or changed and reformed to read so that I will take the property as it descended to me from my father under the law, without changes of any kind, and the only charges that I have put upon it are the two deeds of trust to W. B. Marr, trustee, and to T. J. Timmons, trustee, and I desire all other claims removed, because I have not authorized or requested that any other restrictions and limitations be made.

"2.   The witness, S. W. Jones, husband of Mrs. Ida Jones, testifies that neither he nor his wife prior to the sale had made any requests that the title be made to her and her husband and children, nor in any other manner, than to her in fee; that he understood that Mr. J. C. Sparkman had arranged with Mr. James F. Eggleston to draw the deed.  Further questioned with reference to conversations with the draftsman of the deed, Mr. Jones says:

"13.   What did you say to him?

"A.   I asked him whether he had drawn the deed and whether my name was mentioned in it.

"14.   What did he say?

"A.   My recollection is that he said that he had not drawn the deed and that he would put my name in it.

"15.   What did you mean by asking whether your name was in it?

"A.   I didn't want the deed to cut off my married rights; I wanted it so drawn that, in the event of the death of my wife before my death, I would take the right which a surviving husband has under the law in his wife's land.

"16. Did you mean to ask that the deed be so drawn as to give you any right in your wife's land, which the law did not give you?

"A. I did not.

"17. Your purpose was to see that the deed did not cut off and deny you any right which the law would give you?

"A. That is it.

"18. Did you make any request of Mr. Eggleston to insert in said deed any clause making the conveyance of your wife's share to her and her husband and children, and to her and you during your natural lives, and then to your children or descendants, or anything like that?

"A. I did not.

"19. Did your wife, to your knowledge, at any time make any such request as this?

"A. Not that I know of.

"20. Did she see Mr. Eggleston at any time other than when you were present?

"A. Not that I know of. If she spoke to Mr. Eggleston about the matter, I never heard of it.

"21. Did any one to your knowledge, either on that date or before that time, by and with the consent of your wife, request that the clauses providing for limiting the title to her children and descendants be put in the deed?

"A. I have no knowledge of such request, and I am quite sure that, had she had such idea, she would have said something to me about it.

"22. Did you hear the deed read over that day?

"A. I did.

"23. Who read it over?

"A. Mr. Eggleston.

"24. Was the language of the deed and its meaning, particularly that referring to your wife's share, explained to her?

"A. It was not. The paper was read over rather hurriedly.

"25. Did you understand its terms or make any inquiry about it?

"A. I did not.

"26. As a matter of fact, Mr. Jones, you and your wife had confidence in all of the parties, and simply signed up the deed as it was prepared, did you not?

"A. Yes, sir.

"27. When did you first learn of the objectionable language in the deed?

"A. About three years afterwards, when we had a plan to buy Mrs. Sparkman's land. We tried to borrow money on a mortgage, and the title was declined.

"28. And you never knew anything about these restrictions until that time?

"A. I did not.

"29. You and your wife joined with your adult children in making two deeds of trust on this land, one to W. B. Marr, trustee, and one to T. J. Timmons, trustee; why did you do this, and why did you have the children join?

"A. Financial necessities made it necessary. The lenders would not let us have the money unless the children joined on account of the language of the deed.

"30. What did you and your wife do after you learned of the trouble with the deed?

"A.   We consulted with R. H. Crockett, an attorney in Franklin, and he advised that the only way to get relief would be by a bill to reform the deed.

"31.   Why didn't you file the bill then?

"A.   It was on account of my wife's health. Mr. Crockett advised that it would be better to wait until she was stronger and able to give testimony in the matter, and doctors advised the same thing.   Later the matter of expense deterred us, because we were in financial troubles, and we have just now gotten in a condition where we could employ lawyers and bring these matters before the court.

"32.   Do you know, or have you any idea, who made the request of Mr. Eggleston to insert the clauses complained of in the deed?

"A.   I do not know, and my wife says she does not know.   I am quite sure that neither one of us made such a request, and we did not know it was done.

"33.   Have you had any experience and training in reading and understanding deeds, and do you know the meaning and import of words of limitations and restrictions used in deeds?

"A.   I have had no such training.   I am a farmer with only a common school education, and I have no knowledge of legal terms used in deeds.

"34.   At the time you heard this deed read, did you catch or understand the clauses now complained of purporting to limit the title to your wife's children or descendants, and to vest it other than in her as inherited from her father?

"A.   I did not.

"35. Is it now the desire of both of you that the deed be so reformed as to pass the title to her just as it passed by descent from her father without restrictions of any kind?

"A. It is.

"3. Mrs. M. L. McKee, the widow of George. W. McKee, was present when the instrument was signed, but did not know about the features complained of and was not aware that any request had been made that the deed be drawn in this way, and never heard that Mrs. Jones requested it. Mrs. Jones never talked about it.

"4. Witness Knox S. Jones, one of the complainant's children, testifies that he had no knowledge of the drawing of the deed and knew nothing of the objectionable language until several years afterwards when he joined his mother in an effort to borrow money, and found that the title was objectionable on account of the language in the deed; that he makes no claim to the property, and made no request that the deed be drawn as it was.

"5. Witness James F. Eggleston testified that he is president of the Williamson County Banking & Trust Company and a member of the bar; that he was the draftsman of the deed in question; and in response to questions further testifies:

"6. Who requested you to prepare this paper and furnished you with the data to be included in it?

"A. Mr. J. C. Sparkman, son-in-law of Mrs. McKee, was a regular client of mine, and on the occasion of the execution of this paper he, together with the other parties, came in, and after some considerable discussion as to the terms of the agreement and settlement, the paper was drawn; Mr. Sparkman acting somewhat as spokes-

man for the whole party with reference to the terms and conditions of the paper.

"7.　Was Mrs. Ida Jones and her husband, Sam W. Jones, present there with the others?

"A.　They were.

"8.　Did Mrs. Jones make any statement to you herself with reference to the deed or paper to be drawn and what it should contain with reference to her share of the estate?

"A.　I do not remember that Mrs. Jones made any explicit statement or suggestion with reference to the paper. She, together with her husband, were present, and her husband made some suggestions with reference to the paper; but, as I remember, Mrs. Jones seemed to be unwell physically and had very little to say about the matter.

"9.　I note in the paragraphs on the second sheet of the deed, the paragraph marked third, the conveyance of the share of Mrs. Jones is made to her and husband and children, as requested by her, and in the *habendum* clause the language is used 'to Mrs. Ida Jones and husband S. W. Jones during their natural lives and then to their children or descendants,' and the warranty is to said grantees; please state at whose request or suggestion you embodied this language in the partition deed.

"A.　There was a general discussion about Mrs. Jones' interest in the property, by parties present, Mr. Sparkman being the spokesman, and my understanding was that they desired to fix the share of Mrs. Jones as expressed in the paper.

"10. Did Mrs. Jones herself say anything to you about this or make any request or specify any language that should be used?

"A. Mrs. Jones made no specific request herself. The discussion of the matter was had in her presence, and I, of course, assumed what was suggested by Mr. Sparkman was what she desired.

"11. Did you explain to her the legal effect of this language and what the result would be if the title was limited in the way that this language purports to limit it?

"A. There was a general discussion of the language between Mr. Sparkman and her mother; Mr. Jones to the effect that this language would fix her share so that it could not be incumbered, and that as I understood from Mr. Sparkman was what was desired, and Mrs. Jones assenting as I understand the matter I supposed she wanted, and I read the paper over after it was written in the presence of all of the parties, and they all agreed that it was what was wanted, the effect of the language as already stated. The discussion was in a general way between all parties, and Mr. Sparkman seemed more interested than any one else in having the matter fixed as he directed. There was no protest from Mrs. Jones, and I naturally supposed that it was what she desired also.

"12. As I understand you, then, Mrs. Jones did not make any request of you to insert this language in the deed, that is, the language with reference to limitations which I have referred to, but this request was made by Mr. Sparkman, and as she entered no protest you assumed that he was speaking for her?

"A. Yes, that is correct. They all seemed to look upon Mr. Sparkman as a leader in the matter and seemed

to look upon him as a disinterested adviser, and, as I have already stated, the paper was drawn from the suggestions made.

"13.  I believe you stated that Mrs. Jones at that time was in ill health, and in a rather nervous condition; was that observable from seeing her there, or how did you arrive at this information? '

"A.  As I remember, she complained of not feeling well, and it was also noticeable that she was not in a good state of health, rather nervous and seemed to be laboring under some physical stress.

"14.  Did she as a matter of fact take any part in the discussion which you say was had there between the other members of the party?

"A.  I do not remember that she took any active part in the discussion.  There was first some considerable discussion about the minor, George M. Gooch, in which she took no part, and my recollection is, when it came to fixing the title to her share, that she took no special part in the discussion.

"15.  You had no personal interest in this matter? You were just drawing the deed as is usual for clients applying for such work, and as you understood the directions?

"A.  This is correct.

"16.  And Mr. Sparkman suggested and specified the language to be used, limiting the title of Mrs. Jones' share to her husband, children, or descendants, and as no objection was made, without making a special inquiry of her, you drew the deed that way, understanding and believing that she was assenting to it?

"A. Yes, that is correct. It was a perfectly friendly family settlement, so far as I could observe.

"17. When you read the deed over, I believe you said that Mrs. Jones' attention was not directed to the language used in connection with her share, and its meaning and effect was not explained to her by you?

"A. No, I do not remember to have made any special explanation to Mrs. Jones as to the legal effect of the language conveying her interest; but, as stated before, there had been a general discussion of this matter by Mr. Sparkman, Mr. Jones, and myself, and I, of course, assumed that the language in the instrument expressed the desire of the signers of the instrument.

"18. But further than her silent assent, or her omission to make any objection at the time, there was nothing to indicate affirmatively that she understood the force and effect of the limitation was there?

"A. No; as already stated, she gave no affirmative instruction in the matter."

It will be noted that the lawyer who drafted the instrument states that "There was a general discussion of the language between Mr. Sparkman and her mother (and) Mr. Jones to the effect that this language would fix her share so that it could not be incumbered and that as I understood from Mr. Sparkman was what she desired," etc.

Nobody undertakes to say that this discussion did not take place. It would appear that Mrs. Jones was then willing for the property to be so safeguarded that incumbrances could not be placed on it.

(a) Does this evidence establish that the conveyance was procured by fraud?

To ask the question is to answer it. There is not, so far as we can see, the slightest evidence that anybody wished to take advantage, or did take advantage, of the complainant, Mrs. Jones. Certainly her kinspeople, there assembled, could have had no sinister purpose in having the instrument drafted so as to confer a benefit on her minor children. Mr. Sparkman, the deceased son-in-law, seems merely to have acted as a spokesman in the matter. It is true that the complainant Mrs. Jones was then sick, weak, and nervous. But this cannot in and of itself show that she was defrauded.

We are of opinion that there is no evidence whatever to sustain the charge of fraud.

(b) Can the bill be sustained on the ground of accident?

The equity thus invoked on behalf of complainant was one of the earliest grounds of chancery jurisdiction. But under modern practice its scope has been considerably narrowed. 2 Pom. Eq. (3d Ed.), section 824.

It is thus defined by Mr. Pomeroy:

"Accident is an unforeseen and unexpected event, occurring external to the party affected by it, and of which his own agency is not the proximate cause, whereby, contrary to his own intention and wish, he loses some legal right or becomes subjected to some legal liability, and another person acquires a corresponding legal right, which it would be a violation of good conscience for the latter person, under the circumstances, to retain. If the party's own agency is the proximate cause of the event, it is a mistake rather than an accident." Pom. Eq. (3d Ed.), vol. 2, section 823.

Familiar instances of this jurisdiction occur in suits to set up and supply lost instruments. Thus in *Irwin* v. *Planter' Bank* (1839), 1 Humph. (20 Tenn.), 145, the jurisdiction to give relief in case of notes destroyed by fire was clearly recognized.

In *Scott* v. *Watson* (1878), 3 Tenn. Ch., 652, Chancellor COOPER entertained a bill to supply the record of a judgment of a justice of the peace which had been destroyed by fire.

Other illustrations are found in the jurisdiction of equity to aid the defective execution of powers; e. g., the want of a seal, or of witnesses or signatures. Pom. Eq. (3d Ed.), vol. 2, section 834..

Still another example is found where the defendant, in an action of law, has a good defense on the merits, which he has been prevented from setting up by accident without negligence or inattention on his part. Pom. Eq. (3d Ed.), vol. 2, section 836.

In the light of these principles, we think it evident that the complainant is not entitled to relief on the ground of accident, under the testimony which we have reviewed.

(c) Can relief be afforded on the ground of mistake?

There is, as pointed out by Mr. Pomeroy, a clear distinction between "accident" and "mistake," although they are often grouped together. "Accident," as he explains, is "an unexpected occurrence external to the party affected by it."

"Mistake, on the other hand, is internal; it is a mental condition, a conception, a conviction of the understanding—erroneous, indeed, but none the less a conviction—which influences the will and leads to some outward physical manifestation. Its operation is ordinarily

150 Tenn.—38.

though not always, affirmative—the doing of some act which would not have been done in the absence of the particular conception or conviction which influenced the free action of the will. Its essential prerequisite is ignorance. It is distinguished from fraud, fraudulent representations, or fraudulent concealments by the absence of knowledge and intention, which in legal fraud are actually present, and in constructive fraud are theoretically present, as necessary elements. It is also distinguished from that inattention or absence of thought which are inherent in negligence. The erroneous conception or conviction of the understanding which constitutes the equitable notion of mistake has nothing in common with negligence; equity will not relieve a person from his erroneous acts or omissions resulting from his own negligence. Mistake, therefore, within the meaning of equity, and as the occasion of jurisdiction, is an erroneous mental condition, conception, or conviction, induced by ignorance, misapprehension, or misunderstanding of the truth, but without negligence, and resulting in some act or omission done or suffered erroneously by one or both the parties to a transaction, but without its erroneous character being intended or known at the time." 2 Pom. Eq. (3d Ed.), section 839.

It is well settled that a court of equity may, in a proper case, reform a written instrument on the ground of mistake. But it is equally well settled that this can only be done where the proof is clear and convincing. *Battle et al.* v. *Claiborne* (1915), 133 Tenn., 286, 301, 180 S. W., 584; *Cromwell* v. *Winchester* (1859), 2 Head, 389, 391; *Barnes* v. *Gregory* (1858), 1 Head, 230, 234.

In *Barnes* v. *Gregory,* supra, the court, in granting the relief, said that "the proof leaves no doubt upon the mind."

In *Cromwell* v. *Winchester,* supra, the court, after laying down the rule that equity will grant relief when the mistake is "clearly made out by proof entirely satisfactory," says:

"But if the mistake is not made entirely plain, and put beyond all reasonable controversy, the court will not interpose."

We cannot say that the evidence in the case satisfies the requirements above mentioned. It comes mainly from the husband and wife, and their testimony tends to show inattention rather than mistake.

The draftsman's testimony tends strongly to show that the instrument was the result of a family conference, where the terms embodied were fully discussed, and no objection was made by any one.

Frequently in these cases relief is given on account of some error or omission on the part of the draftsman. *Alexander* v. *Shapard* (1921), 146 Tenn., 90, 106, 108, 240 S. W., 287; 23 R. C. L., 326.

But there is no claim here that the draftsman omitted anything, or that he wrote anything, but what he was directed to write in the presence of all the interested parties.

The wife, Mrs. Jones, was sick and nervous, as the proof shows; but there was nothing wrong with her husband, and no reason appears why he could not fully appreciate the wording of the deed.

It is said that they were simple country people, and did not understand legal phraseology. But there are

no technical words used by the draftsman in the clauses to which they object. He does not even use the word "remainder." The language is "to Mrs. Ida Jones and husband S. W. Jones during their natural lives and then to their children or descendants."

As already pointed out, neither husband nor wife deny the statement of the draftsman that there was a discussion "to the effect that this language would fix her share so that it would not be incumbered."

But apart from this, there is another principle which precludes relief on the ground of mistake.

As stated in the case of *Pittsburg Lumber Co.* v. *Shell* (1916), 136 Tenn., 466, 472, 189 S. W., 879, 880:

"To be the subject of correction, a mistake must have been mutual, or there must have been a mistake of one party influenced by fraud of the other. *Baker* v. *Harlan,* 71 Tenn., (3 Lea), 505; *Graham* v. *Guinn* (Ch. App.), 43 S. W., 749."

There is no showing here of any mutual mistake. And, as we have already held, there is no proof at all to show any fraud.

So even if the proof in this case were sufficiently clear and satisfying, in so far as the complainant is concerned, her case would fail because there is no evidence of mutual mistake or fraud.

Third. It is apparent that no relief can be granted under chapter 13 of the Acts of 1919.

The substance of this act, in so far as it may have afforded any ground for additional relief in equity, appears in section 1, which reads as follows:

"Section 1. Be it enacted by the General Assembly of the State of Tennessee, that in any suit in equity brought

Jones v. Jones.

in any court of the State under its general equity juris-diction to quiet, perfect, or adjudge the title to real estate, or to remove clouds from the title thereof, situated within the State in which suit it is sought to determine the rights or claims of any person or persons not in being, such person or persons may be made parties defendant, and such parties defendant may be designated by general words of description, such as the unborn children or representatives of children of A. B. a living person."

Under this act unborn remaindermen were made parties in the case at bar. But since the complainant Mrs. Jones was not entitled to reform the deed, there was no cloud to be removed from her title.

It results that the decrees of the chancellor and of the court of civil appeals must be reversed, and the bill dismissed.